1 | MARTORELL LAW APC
Eduardo Martorell, State Bar No. 240027
2 | EMartorell@Martorell-Law.com
Angelo E. Mishriki, State Bar No. 305069
3 | AMishriki@Martorell-Law.com
Howard Hughes Center
4 | 6100 Center Drive, Suite 1130
Los Angeles, California 90045
5 | Telephone: (323) 840-1200
Facsimile: (323) 840-1300
6
7 | Attorneys for Plaintiff,
METRICOLOR LLC
8
9 | **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**
10
11
METRICOLOR LLC,  |  Case No. 2:18-cv-364
12
          Plaintiff,  |  **COMPLAINT FOR:**
13
v.  |  1. **PATENT INFRINGEMENT,**
14 |   |    **35 U.S.C. § 1** *et seq.*
L'ORÉAL S.A.; L'ORÉAL USA, INC.;  |  2. **BREACH OF CONTRACT;**
15 | L'ORÉAL USA PRODUCTS, INC.;  |  3. **MISAPPROPRIATION OF**
L'ORÉAL USA S/D, INC.; REDKEN  |     **TRADE SECRETS (DEFEND**
16 | 5TH AVENUE NYC, LLC; and DOES 1  |     **TRADE SECRETS ACT)**
through 100, inclusive,  |  4. **BREACH OF THE**
17 |   |     **COVENANT OF GOOD**
          Defendants.  |     **FAITH AND FAIR DEALING**
18 |   |  5. **FEDERAL FALSE**
   |     **ADVERTISING, 15 U.S.C. §**
19 |   |     **1125(A)**
   |  6. **STATUTORY FALSE**
20 |   |     **ADVERTISING UNDER**
   |     **CALIFORNIA BUSINESS**
21 |   |     **AND PROFESSIONS CODE**
   |     **§ 17500** *et seq.*
22 |   |  7. **VIOLATION OF**
   |     **CALIFORNIA'S UNFAIR**
23 |   |     **COMPETITION LAW**
   |     **("UCL") (CAL. BUS. &**
24 |   |     **PROF. CODE §§ 17200,** *et*
   |     *seq.*)
25 |   |  8. **COMMON LAW BREACH**
   |     **OF CONFIDENCE**
26
   |  **DEMAND FOR JURY TRIAL**
27
28

COMPLAINT FOR DAMAGES

**COMPLAINT**

PLAINTIFF, METRICOLOR LLC ("Plaintiff" or "Metricolor"), by and through its counsel, respectfully brings this Complaint against Defendants L'ORÉAL S.A., L'ORÉAL USA, INC. ("L'Oréal USA, Inc."), L'ORÉAL USA PRODUCTS, INC., ("L'Oréal USA Products, Inc."), L'ORÉAL USA S/D, INC. ("L'Oréal USA S/D, Inc."), REDKEN 5TH AVENUE NYC, LLC ("Redken") (collectively, the "L'Oréal Defendants" or "L'Oréal"), and Does 1-100 ("Does"), to obtain damages, injunctive relief, and other appropriate relief from all of the above defendants (collectively, the "Defendants") and alleges as follows upon knowledge as to itself and otherwise upon information and belief:

**NATURE OF THE ACTION**

1.      L'Oréal S.A. is a French cosmetics company and the corporate parent company of the L'Oréal Defendants. L'Oréal is the self-proclaimed world-leader in beauty products, including makeup, cosmetics, haircare, and perfume.  As of 2016, they boast of a presence in 140 countries, profits equaling approximately 4.54 billion euros, and 473 registered patents.

2.      Plaintiff, in contrast, is a small and new startup company.  Stephen D'Amico, a master hairstylist who has worked in salons in New York City, Beverly Hills, and now works in Manhattan Beach, California, founded Metricolor LLC with his father, Salvatore D'Amico.

3.      Plaintiff's flagship product provides a revolutionary way to store, formulate and dispense hair coloring agents and additives (the "Metricolor System"). The Metricolor System is designed to allow hairstylists the ability to package, store, dispense, mix, combine, and formulate hair coloring agents and additives with time- and cost-saving efficiency and accuracy, in a highly-sustainable manner never before seen in the haircare industry.

4.     On January 14, 2013, Plaintiff filed a provisional patent application with the United States Patent and Trademark Office, which provisional application was published on July 17, 2014.

5.     In August 2014, after Plaintiff's provisional patent application was published, Plaintiff engaged in confidential discussions with Defendants regarding the potential sale, partnership or licensing of the Metricolor System.  After numerous discussions, L'Oréal, and Metricolor's founders, Stephen D'Amico and Salvatore D'Amico, signed a Non-Disclosure Agreement.  The parties entered into the agreement, supplied by L'Oreal, for purposes of aiding further discussion regarding the design and production of the Metricolor System, and in order to explore a potential joint venture, licensing arrangement or acquisition.

6.     Over the course of approximately 18 months of discussions and negotiations regarding L'Oréal's *supposed* interest in purchasing the Metricolor System in some fashion, L'Oréal received Metricolor's sought-after confidential information, including, crucially, all the knowledge necessary to fully understand how the System worked and how it could be replicated.  In June 2016, having no further need to continue negotiations given that L'Oréal was now ready to create an effective competing product, L'Oréal ceased all communications.  Just three months later, in September 2016, L'Oréal released two competing products, via two different L'Oréal brands, featuring and directly advertising Metricolor's patented components: the Matrix DMI Brand's (the "Matrix Brand") Matrixcolor Bond Ultim8 product and the Redken 5th Avenue NYC Brand's (the "Redken Brand") pH-Bonder product.

## **PARTIES**

7.     Plaintiff Metricolor, LLC is incorporated under the laws of the State of California, with its principal place of business in Palos Verdes Estates, California.

8.     Defendant L'Oréal S.A. is a French corporation, headquartered at 41 Rue Marte, Clichy, Paris, Ile-de-France 92117, France.

1        9.      Defendant L'Oréal USA, Inc. ("L'Oréal USA, Inc.") is a Delaware

2   corporation, headquartered at 10 Hudson Yards, New York, New York.

3        10.     Defendant L'Oréal USA Products, Inc. ("L'Oréal USA Products, Inc.")

4   is a Delaware corporation, headquartered at 10 Hudson Yards, New York, New

5   York, and is a subsidiary of L'Oréal USA, Inc.

6        11.     Defendant L'Oréal USA S/D, Inc. ("L'Oréal USA S/D, Inc.") is a

7   Delaware corporation, headquartered at 10 Hudson Yards, New York, New York,

8   and is a subsidiary of L'Oréal USA, Inc.

9        12.     Defendant Redken 5th Avenue N.Y.C. LLC ("Redken") is a New York

10  corporation headquartered at 10 Hudson Yards, New York, New York, and is a

11  subsidiary of L'Oréal USA, Inc.

12       13.     The true names, identities, or capacities, whether individual, associate,

13  corporate, or otherwise, of defendants DOES 1 through 100, inclusive, and each

14  DOE in between, are unknown to Plaintiff at this time, and Plaintiff therefore sues

15  said defendants by such fictitious names. When the true names, identities, capacities,

16  or participation of such fictitiously designated defendants are ascertained, Plaintiff

17  will ask leave of Court to amend the Complaint to insert said names, identities, or

18  capacities, together with the proper charging allegations.  Plaintiff is informed and

19  believes and thereon alleges that each of the defendants sued herein as a DOE is

20  responsible in some manner for the events and happenings herein referred to, thereby

21  legally causing the damages to Plaintiff as hereinafter set forth.

22       14.     At all times mentioned herein, each of the defendants sued herein was

23  the agent, servant, alter ego, employee, employer, master, principal and/or associate

24  of each other and of his/her/its co-defendants, and, as such, was acting within the

25  time, place, purpose, and scope of said agency, service, employment, partnership

26  and/or association.

27

28

## JURISDICTION AND VENUE

15.     This action includes a claim for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including §§ 271 and 281. This Court has original jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a), and over the federal false advertising claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1367. This Court also has subject matter jurisdiction over the related California state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b). L'Oréal has one or more regular and established places of business in this judicial district, and transacts business in this district. For example, L'Oréal USA Products and L'Oréal USA S/D are registered with the State of California to do business here. L'Oréal is responsible for acts of infringement occurring in the Central District of California, as alleged in this Complaint, and has delivered or caused to be delivered infringing products or services in the Central District of California. L'Oréal also has caused the infringing products to be advertised, promoted, and sold in this judicial district.

17.     Moreover, Metricolor, LLC is headquartered in the Central District of California, where the harm from L'Oréal's infringement and tortious conduct has been and is being felt.

## BACKGROUND

**Metricolor's Revolutionary Hair Color Formulation, Dispensing, and Storage System**

18.     Stephen D'Amico has been a hairstylist since 2001.  His vast experience and skill have allowed him to work within successful salons in New York City as well as Manhattan Beach and Beverly Hills, California.

19.     Stephen first initially conceived of the idea for the Metricolor System while a student in cosmetology school in 2000.  Frustrated by the inaccurate,

1  inefficient, and wasteful system common to the industry at that time, he knew there
2  had to be a better way.  At that same time, he frequently visited his disabled brother,
3  afflicted with spina bifida, in the hospital.  As he intently watched nurses use a
4  syringe to accurately withdraw and dispense a precise measurement of antibiotics
5  from an I.V., a lightbulb went off in Stephen's head.  He decided that salons and
6  hairstylists could use similar methodology to accurately, efficiently and sustainably
7  measure hair coloring agents and additives.  Over the next twelve years, Stephen
8  dedicated himself, along with his retired father, to creating prototypes, obtaining a
9  patent and making his vision into a reality – Metricolor was born.

10        20.     On January 14, 2013, the D'Amicos filed a provisional patent
11  application, and a subsequent patent for the Metricolor System, which was published
12  in July 17, 2014.  After this patent was published, on August 25, 2014, the D'Amicos
13  began to engage in confidential discussions with Defendants regarding the use and
14  potential sale of the Metricolor System.

15        21.     As a stylist and haircare professional, Stephen D'Amico realized that
16  the haircare industry needed to change.  Traditional hair coloring systems – which
17  have remained the same for over 60 years – are typically cumbersome and wasteful.
18  In 2014, Stephen D'Amico, invented the Metricolor System – a significant paradigm-
19  shift from the old and inefficient methods prevailing in the haircare industry.

20        22.     The Metricolor System, in contrast to traditional means of mixing and
21  dispensing hair coloring agents and additives, allows a user to quickly and accurately
22  measure and dispense said hair coloring agents or additives using a syringe.  This
23  system allows stylists and haircare professionals to easily and accurately measure out
24  exact portions of hair coloring agents and additives, preventing waste of materials,
25  waste of time in locating proper containers, and allowing both stylists and customers
26  to engage in a more clean, cost-effective and environmentally-friendly hair styling
27  experience.

28

23.    Other hair coloring systems currently available on the market typically comprise a series of capped tubes, such as collapsible aluminum tubes or bottle-type containers, each containing a different hair coloring agent or additive paste or liquid. During the hair coloring process, a stylist dispenses the desired amount of hair coloring agents and/or additives into a mixing receptacle to achieve a desired color.

24.    A problem with these containers is that stylists are often required to measure certain amounts by sight or "squeeze to a line" in the mixing receptacle itself. This inaccurate process makes it difficult for stylists to measure properly since a change of even 0.1 milliliters can alter the hue of a color mixture. In addition, due to the nature of these aluminum tubes (similar to toothpaste tubes), it is difficult to dispense all of the liquid or paste from a single tube, leading to a waste of approximately 25% of the product in a typical tube. In fact, independent studies have found that despite best efforts, tube and receptacle markings were only accurate to +/- 50% of the total volume of the liquid or paste in the container itself[1]. This inherent inconsistency is also very wasteful, and constitutes a significant expense for salons and stylists.

25.    Another problem evident in traditional hair care systems is that the products are sensitive to oxidation, which leads to wasteful aluminum tubes creating a mess at salons. The use of many bottles and tubes makes organization very difficult. Due to the speed at which hair care professionals work and the numerous clients on which they work daily, the heaps of unorganized and cumbersome aluminum tubes and other containers increase the likelihood of mistakes, waste time, and create inefficiency.

---

[1] These studies were cited in an article by Debbie Miller, a salon professional and a "Global Performing Business Artist" for Redken 5th Avenue NYC and the Redken Brand. The article, published by Stylist and Salon Newspapers' September 2010 issue of Northwest Stylist Magazine, was entitled, "Point, Click, Color: Modern Technology Takes Off at the Color Bar." The article can be found at the URL:
http://www.nwstylist.com/features/2010/0910_features/0910_modern_technology_color_bar.html (accessed January 15, 2018).

26.     The Metricolor System solves all these problems. The Metricolor System's patented delivery allows for accurate and repeatable measurements that prevent waste and allow for the consistent mixture of hair coloring agents and additives.

27.     These poly-plastic containers are fitted with a flip-top cap and orifice reducer at the opening that prevents product dripping and reduces oxidation, as seen in the image below, on the left.  A graduated syringe, as seen in the image below, on the right, engages the orifice reducer and allows stylists to measure out and dispense an exact amount of the necessary hair coloring agent or additive every time.  In contrast with traditional hair coloring agent or additive systems, the syringe allows for an accuracy of +/- 1% in measuring liquids/pastes.



28.     This accuracy, in combination with the reusable syringe and the easily-stored rack storage system, makes the Metricolor System unique in the field of hair coloring systems.

29.      In fact, recent publications have praised Metricolor's revolutionary system as a paradigm shift in the hair styling industry.

**Metricolor's Patents**

30.     Metricolor initially filed a provisional patent application on January 14, 2013, allowing Metricolor a priority filing date of January 14, 2013.  The provisional application was published on July 17, 2014.

31.     Metricolor is the owner of United States Patent No. 9,301,587 (the "'587 Patent" or "Asserted Patent") entitled "Hair Color (or Dye) Storage, Dispensing and Measurement (or Measuring) System," which the United States

Patent and Trademark Office duly and legally issued on April 5, 2016.  A true and correct copy of the '587 Patent is attached hereto as Exhibit A.

32.    Metricolor's provisional application had already been published before any negotiations regarding the Metricolor System had begun with the L'Oréal Defendants.  At the start of these negotiations, L'Oréal was made aware of the existence of Metricolor's provisional patent and Metricolor's overt intent to continue to pursue further patent protection, which culminated in the issuance and publication of the '587 Patent.

33.    Metricolor is the owner of the '587 Patent and is entitled to pursue recovery of royalties and damages for infringement of the '587 Patent.  Metricolor is also entitled to damages which it suffered as a result of the L'Oreal Defendants' unfair business practices and ill-intentioned dealings, which caused Metricolor to delay entering the market and reaping the benefits of being the first entrant in the market with its patented technology.

34.    Additionally, Metricolor has not licensed the '587 Patent for use to any other entity or person, and has not now nor at any point authorized Defendants to use any patented component of the '587 Patent.

35.    Each claim of the '587 Patent is valid and enforceable.

36.    The '587 Patent claims describe, *inter alia*, an apparatus and method for storing, measuring and dispensing various hair coloring agents and additives.

37.    Claim 1 of the '587 Patent describes the apparatus for storing, measuring and dispensing hair coloring agents and additives.  The apparatus generally comprises: (1) a graduated measuring and dispensing vessel; (2) a container comprising an air-tight chamber, an opening with an air-tight re-closing seal which can engage with the graduated measuring vessel; and, (3) a means for engaging the container with a supporting container-holder, such as a rack.

38.     Claims 1, 9, 10, and 11 of the '587 Patent describe the graduated measuring and dispensing vessel as a reusable catheter syringe, which is tapered to allow for a secure connection with the hair coloring agent or additive containers.

39.     Claims 1, 3, and 4 describe a poly-plastic container, which is comprised of an outer layer of semi-rigid poly-plastic material and which includes an opening at the bottom of the container relative to a container label, such that the container is faced down to engage with the catheter syringe described above.

40.     Claims 1 and 5 describe an "orifice reducer" which is an air-reducing seal that allows for the catheter syringe to engage with the hair coloring agent or additive containers in a controlled manner, so as to extract specific, measured amounts of hair coloring agent or additive while preventing leakage and reducing wasteful oxidation of the hair coloring agent or additive.

41.     Claim 14 of the '587 Patent describes a methodology for storing, measuring and dispensing hair coloring agent or additive using the apparatus described elsewhere in the '587 Patent.  Specifically, Claim 14 of the '587 Patent describes the following steps: (1) providing a first container with an air-tight, re-closable seal containing a quantity of hair coloring agent or additive; (2) providing a graduated measuring and dispensing vessel capable of holding a predetermined quantity of hair coloring agent or additive (the catheter syringe); (3) accessing the first container with the graduated measuring vessel (the catheter syringe) and withdrawing a first predetermined quantity of hair coloring agent or additive from the first container; (4) dispensing this first quantity into a mixing bowl; (5) providing a second container with an air-tight re-closable seal containing a quantity of hair coloring agent or additive; (6) accessing the second container with the graduated measuring and dispensing vessel (the catheter syringe) and withdrawing a second predetermined quantity of hair coloring agent or additive from the second container; (7) dispensing the second predetermined quantity into the mixing bowl; (8) mixing the two quantities of hair coloring agents or additives together.

COMPLAINT FOR DAMAGES

**L'Oréal Acquires Metricolor's Confidential Information and then Abruptly Terminates Acquisition Talks**

42. On or around August 14, 2014, Plaintiff's founders, Salvatore and Stephen D'Amico (the "D'Amicos"), spoke with the President of the Professional Products Division of L'Oréal USA, Patrick Parenty ("Parenty"), and discussed the potential for L'Oréal's interest in the acquisition or licensing of the Metricolor System (the "Failed Deal"). On August 25, 2014, the parties signed a Mutual Non-Disclosure Agreement (the "Agreement") supplied by L'Oreal. A true and correct copy of the Agreement is attached hereto as Exhibit B.

43. Pursuant to the Agreement, both parties informally agreed that Metericolor would provide exclusivity to L'Oréal during the time these discussions continued, and not market the Metricolor system to competitors or release the System in the open market. During this period of initial discussion, L'Oreal executives were clearly advised by the D'Amico's of the existence of the provisional patent for the Metricolor System and the D'Amicos' clear intent to continue to pursue further patent protection with the United States Patent and Trademark Office.

44. The Agreement, signed and executed by both parties, included express provisions wherein L'Oréal agreed not to "copy or reproduce all or any part of such Confidential Information in any medium" except as was necessary to effectuate L'Oréal's collaboration with Metricolor.

45. Under the Agreement, L'Oréal further agreed to "not decompile, disassemble or reverse engineer all or any part of [the Metricolor System] without the written permission of [Metricolor]."

46. On October 15, 2014, the D'Amicos first met with Parenty and Scott Schienver (Vice President of Operations-Supply Chain) at L'Oréal USA's headquarters in New York City. During this meeting, the D'Amicos presented and demonstrated the Metricolor System, thereby providing L'Oreal with confidential trade-secret information regarding the application and use of the Metricolor System.

As a result of the meeting, Parenty referred the project to L'Oréal's Matrix Brand. The very next day. L'Oreal demonstrated their continued interest by sending the D'Amicos 8 large boxes with hundreds of samples of their entire line of hair coloring products for the D'Amicos to test with the Metricolor System.

47.    Shortly after this meeting in October 2014, the D'Amicos were contacted by Marika Rex, the Senior Vice President of the Matrix Brand. Despite L'Oréal's supposed interest, no response was forthcoming until a meeting was held again in New York City in January 2015. At such meeting, the D'Amicos met with Scott Schienver, Marika Rex, and Stephanie Martins, the Vice President of Packaging and Development for L'Oreal.

48.    Discussions again stalled after this meeting until the Matrix Brand underwent a reorganization of their leadership in Fall 2015. Between October and November 2015, the D'Amicos continued discussions and meetings with various divisions of L'Oréal, including L'Oréal Global and the new leadership of the Matrix Brand. Specifically, in November 2015, the D'Amicos met with Daniel Bethelmy-Rader, Marika Rex, and Stephanie Martins regarding L'Oréal's great interest in the Metricolor System.

49.    After this meeting, discussions stalled for unknown reasons and still having heard nothing from L'Oréal, Salvatore D'Amico sent an email to L'Oréal on February 22, 2016 and indicated Plaintiff's intent to take the Metricolor System to the market if L'Oréal did not commit to the Metricolor System.

50.    On March 10, 2016, Marta Wolska-Brys, the new Director of Open-Innovation and Packaging at L'Oréal Americas contacted the D'Amicos and indicated that L'Oréal was "very interested" in the Metricolor System.

51.    Around this time, the D'Amicos also spoke with corporate executives Anne DeBouge and Anne Alcoloumbre from L'Oréal Group France who specifically asked the D'Amicos for ten samples of the Metricolor System.

52. Between April and June 2016, formal negotiations began regarding an Exclusive Evaluation Agreement between the D'Amicos' licensing consultant and negotiator, Rand Brenner, and Marta Wolska, Nathan Gallup (L'Oréal's attorney), and Michael Alekshun (L'Oréal's Vice President of Research and Innovation and L'Oréal's negotiator).

53. Despite these discussions, on June 16, 2016, L'Oréal's negotiator (Michael Alekshun) contacted Metricolor's negotiator (Rand Brenner) and indicated that L'Oréal would be terminating the negotiations. L'Oreal provided no reason for the sudden termination of negotiations that had been ongoing for nearly two years.

54. On or around September 2016, after three months of silence from L'Oréal and its representatives, L'Oréal launched two new products under the Matrix Brand and the Redken Brand (the Matrix Brand's Matrixcolor Bond Ultim8 product and the Redken Brand's pH-Bonder product), which specifically include and directly advertise Plaintiff's patented components.

55. On January 9, 2017, Salvatore D'Amico sent an email to Daniel Bethelmy-Rader regarding Metricolor's intent to place the Metricolor system in the marketplace and commence meetings with other interested parties. Salvatore D'Amico, on behalf of Metricolor, also indicated, clearly and directly, that Metricolor will continue to honor the Non-Disclosure Agreement signed by the parties and expected L'Oréal to do the same. Metricolor also requested that L'Oréal return any and all presentation materials regarding Metricolor's confidential information still in L'Oréal's possession. Until the date of the filing of this Complaint, this information still has not been returned, contrary to the overt requirements of the Non-Disclosure Agreement, which provides that "Receiving Party will upon the Disclosing Party's request, (a) promptly return any and all materials containing Confidential Information to the Disclosing Party; or (b) destroy such materials and certify their destruction in writing to the Disclosing Party." *See* NDA at ℙ 7.

**L'Oréal Willfully Copies the Metricolor System in its Matrix Brand Matrixcolor Bond Ultim8 Product**

56.    L'Oréal's Matrix Brand is tailored to haircare and hair styling products. They advertise haircare products such as conditioners and lotions as well as products designed to color, style and texture hair.  A true and correct copy of Matrix's webpages (visited January 15, 2018) are attached hereto as Exhibit C ("Ex. C").[2] Matrix's webpage (https://www.matrix.com/hair-color/bond-ultim8) (accessed January 15, 2018) also features a link to a separate webpage for professionals, where salon professionals and stylists can log in, examine available products and their potential uses, get certified in using Matrix products, get their salons listed on Matrix's website, and communicate with other stylists and professionals.  *See* Ex. C.

57.    The Bond Ultim8 product is advertised under the banner "MATRIXCOLOR," with the word "color" appearing in red (Ex. C, at 2), in striking similarity to Metricolor's name, as well as its color scheme and logo, which features the word "Metric" underlined by red measuring tape (http://www.metricolor.com) (accessed January 15, 2018). A true and correct copy of Metricolor's website, featuring its logo (visited January 15, 2018), is attached hereto as Exhibit D ("Ex. D").

58.    The Bond Ultim8 product is a kit that includes three containers of liquid, comprising an "amplifier," a "sealer," and a "weekly sealing treatment."  Also included in this kit is a graduated syringe identical to the graduated syringe featured in Metricolor's patented system.

---

[2] Plaintiff reminds Defendants of their duty to preserve this and all other relevant evidence.



59.    The webpage for the Bond Ultim8 product also clearly features the following section regarding the usage of the syringe.

**HOW DO I USE THE SYRINGE?**
1. Remove cap of Step 1 Amplifier
2. Snap the orifice securely into the bottle neck with the ridged end facing into the bottle.
3. Push air out of syringe. Firmly push syringe into bottle opening.
4. Turn the bottle upside down and pull syringe to the correct dose.
5. Dispense liquid slowly into lightener/color mixture. Rinse syringe after each use.

60.    Claim 14 of the '587 Patent clearly reads on this set of steps and instructs users on how to use the graduated syringe in the same way as the Bond Ultim8 product.

61.    The Matrix Professionals' web portal also includes a Youtube playlist featuring videos of hair stylists instructing views on the proper usage of the Bond Ultim8 product.  These videos all feature prominent use of unlawfully copied elements of the Metricolor System.

62.    As seen below, the image on the left is captured from Metricolor's '587 Patent, and features Metricolor's patented graduated syringe apparatus injecting a measured amount of liquid or paste into a mixing receptacle.  The image on the right appears in L'Oréal's Bond Ultim8's advertisings and clearly shows a seemingly identical graduated syringe injecting a measured amount of liquid or paste into a mixing receptacle.  Claim 14 of the '587 Patent clearly reads on this process.





FIG. 7

63.    The Matrix Brand's online presence also features prominent use of these patented features central to the function of the Metricolor System.  A YouTube video entitled "Introducing NEW! Bond Ultim8 Bond Protection System | Matrix," uploaded on February 27, 2017 by an account held by the Matrix Brand features a hair stylist using a graduated syringe to extract an exact amount of different hair coloring agents or additives and inserting them into a mixing receptacle.  A screen capture of this use is found below.  The stylist, while using the graduated syringe, comments, "I love using this syringe because it really gives me precise measurements." (https://www.youtube.com/watch?v=zR0B44TpvLM) (accessed January 15, 2018).



64.     Other videos on the Matrix YouTube page also feature stylists instructing users on the proper usage of the Matrixcolor Bond Ultim8 product.  In these videos, other stylists are also clearly shown using a graduated syringe.

65.     The Matrixcolor line even features a hair coloring agent or additive product which is packaged into a pouch design (as seen below), in strikingly similarity to Metricolor's pouch design for its hair coloring agent and additive containers.



## L'Oréal Willfully Copies the Metricolor System in its Redken pH-Bonder Product

66.     L'Oréal also advertises, through its subsidiary Redken 5th Avenue NYC, the product pH-Bonder, which features three separate containers of various liquids, which are mixed using a syringe, seemingly identical to Metricolor's patented graduated syringe apparatus as well as Metricolor's patented methodology, and as seen below.

67.     A true and correct copy of the Redken 5th Avenue NYC brand webpage featuring the pH-Bonder product (accessed January 15, 2018) is attached hereto as Exhibit E ("Ex. E").

68.     A YouTube marketing video uploaded by "RedkenCANADA" shows users how to use the Redken pH-Bonder product.  The video, uploaded on April 11, 2017, is entitled "pH Bonder Product Knowledge."

(https://www.youtube.com/watch?v=1v1Nur5A6Uk) (accessed January 15, 2018)

69.     In this video, a stylist is clearly shown describing the process of using the Redken pH-Bonder product.  He is also clearly seen using the syringe to extract a hair coloring agent or additive from a plastic container and then mixing it with additional hair coloring agents and additives in a mixing receptacle.  Claims 1, 9, 10, and 11 of the '587 Patent clearly read on this usage of the syringe by Redken.  Further, Claim 14 of '587 Patent also clearly reads on this methodology.  Below, follow some images from this YouTube video, showing the infringing use.





## **FIRST CAUSE OF ACTION**

**(Patent Infringement, 35 U.S.C. § 1 *et seq.* – Against L'Oréal Defendants and DOES 1 through 100, inclusive)**

70.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

71.     All of the products introduced into the market by Defendants, including the Matrixcolor Bond Ultim8, and the Redken pH-Bonder (the "Accused Products"), all feature and directly advertise the protected claims in the '587 Patent.

72.     Claim 1 of the '587 Patent reads as follows: "An apparatus for preparing a hair coloring comprising: a graduated measuring and dispensing vessel; a container having a hair dye contained therein, the container comprising an airtight chamber and

an opening; the container further including means for engaging the container with a container holder to support the container; an airtight reclosing seal at the opening, such that when the measuring and dispensing vessel engages the airtight reclosing seal, the hair dye may be extracted from the airtight chamber, and when the measuring and dispensing vessel is disengaged from the container, the airtight reclosing seal closes off the airtight chamber; and thereby permitting a known quantity of the hair dye to be withdrawn from the container into the measuring and dispensing vessel, allowing an accurate and repeatable quantity of hair dye to be dispensed from the container."

73.    The Accused Products all prominently feature the apparatus described in Claim 1 of the '587 Patent feature and overtly advertise the claimed elements in Claim 1 of the '587 Patent.  The Accused Products all feature a "graduated measuring and dispensing vessel" in their use of a reusable catheter syringe identical to the one described in the Metricolor System.  The Accused Products also feature a container in the form of a similar poly-plastic container as described in the Metricolor System, which contains a hair coloring agent or additive; these containers also contain a similar air-tight chamber and opening as well as a means for engaging the container with the syringe allowing for an accurate and repeatable quantity of hair coloring agent or additive to be dispensed from the container.

74.    Claim 3 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the container includes an outer layer made of a semi-rigid poly plastic material."

75.    The Accused Products all feature and directly advertise containers which are comprised of semi-rigid containers or plastic bottles, as described above.

76.    Claim 4 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the opening is at the bottom of the container relative to a container label." The purpose of this downward positioning is to allow the catheter syringe to engage with the poly-plastic container easily and to allow the hair coloring agents or

additives contained within the containers to most easily flow out from the container and into the syringe.

77.    The Accused Products all feature an opening, which requires the container to be positioned downward to allow the hair coloring agents or additives to flow downward into the syringe, exactly as demonstrated and instructed in the '587 Patent and the methodology of the Metricolor System (as laid out in Claim 14 of the '587 Patent),

78.    Claim 5 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the air-tight reclosing seal comprises a self-sealing orifice reducer." The purpose of this feature is to limit the exposure of the hair coloring agent or additive's exposure to oxidation and limit the likelihood of leakage.

79.    The Accused Products also all use closure apparatuses which feature orifice-reducing qualities to mitigate against leakage and oxidation, using the materials and methods used in the Metricolor System.

80.    Claim 9 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the measuring and dispensing vessel comprises a reusable syringe."

81.    The Accused Products all prominently feature and directly advertise the use of a reusable syringe, as described above.

82.    Claim 10 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the opening and the measuring and dispensing vessel comprise a luer-lock arrangement with a shut-off valve." A luer-lock is a kind of tapering which is a standardized system of small-scale fluid fittings used for making leak-free connections.

83.    Claim 11 of the '587 Patent reads as follows: "The apparatus of claim 1 wherein the measuring and dispensing vessel comprises an oxygen-free barrier."

84.    Like the Metricolor System, which describes the use of an oxygen-free syringe, the Accused Products' syringes also include this feature.

85.  Claim 13 of the '587 Patent reads as follows: "The apparatus of claim 1 further comprising a mixing bowl for mixing dispensed hair dyes."

86.  The Metricolor System features a bowl wherein hair coloring agents or additives are mixed.  All Accused Products, as described above, copy this claimed aspect of the '587 Patent.

87.  Claim 14 of the '587 Patent reads as follows: "A method of coloring hair, comprising the steps of: providing a first container having a quantity of hair dye contained therein; providing a first opening in the first container with an airtight reclosable seal on the first container; providing a graduated measuring and dispensing vessel capable of holding a predetermined quantity of hair dye; accessing the first opening with the graduated measuring and dispensing vessel and withdrawing a first predetermined quantity of hair dye from the first container; dispensing the first predetermined quantity of hair dye into a mixing bowl; providing a second container having a quantity of hair dye contained therein; providing a second opening in the second container with an airtight reclosable seal on the second container; accessing the second opening with the graduated measuring an dispensing vessel and withdrawing a second predetermined quantity of hair dye from the second container; dispensing the second predetermined quantity of hair dye into the mixing bowl; and mixing the first predetermined quantity of hair dye and second predetermined quantity of hair dye together."

88.  The Accused Products' advertised use includes this very methodology described in Claim 14 of the '587 Patent.

89.  Defendants also indirectly infringe one or more claims of the '587 Patent by contributing to patent infringement in violation of 35 U.S.C. 271(c) and/or by inducing others to commit patent infringement, in violation of 35 U.S.C. 271(b) and (f).  The Accused Products were designed by Defendants and with Defendants' knowledge in a manner that would infringe the '587 Patent.  Moreover, the Accused Products have no known substantial non-infringing use, and the infringing use of the

1 | Accused Products is a material and substantial part of the invention claimed by the

2 | '587 Patent. Defendants also contribute to patent infringement and/or induce others

3 | to infringe one of more of the claims of the '587 Patent by having made, designed,

4 | offered for sale, provided, used, maintained and/or supported means for use of the

5 | Accused Products by third-parties as well as for use of the claims of the '587 Patent.

6 | 90. As a result of Defendants' actions and omissions, as well as Defendants'

7 | *ongoing* patent infringement, Plaintiff has suffered actual and statutory damages in

8 | an amount to be proven at trial.

9 | **SECOND CAUSE OF ACTION**

10 | **(Breach of Contract – Against the L'Oréal Defendants and DOES 1 through**

11 | **100, inclusive)**

12 | 91. Plaintiff incorporates the foregoing paragraphs as if fully set forth

13 | herein.

14 | 92. As described above, Plaintiff and the L'Oréal Defendants signed and

15 | executed a Mutual Non-Disclosure Agreement (the "Agreement") whereby the

16 | L'Oréal Defendants were bound to refrain from improper disclosure of confidential

17 | information.

18 | 93. Critically, the L'Oréal Defendants were also bound, and are currently

19 | bound, to not copy, reproduce, decompile or reverse engineer any portion of the

20 | Metricolor System.

21 | 94. The L'Oréal Defendants breached the Agreement and copied,

22 | reproduced, decompiled and reverse engineered the Metricolor System in creating

23 | the L'Oréal products described above.

24 | 95. By copying, reproducing, decompiling and reverse-engineering the

25 | Metricolor System and creating knock-off brands which infringe the '587 Patent, the

26 | L'Oréal Defendants have and continue to significantly and materially harm Plaintiff

27 | by their breach of the Agreement.

28 |

96.     Plaintiff reasonably relied on the L'Oréal Defendants abiding by the terms of the Agreement, and in turn, fully complied, and remain compliant with all the terms of the Agreement and did not, at any time, breach any provision of or requirement under the Agreement.

97.     As a result of Defendants' actions and omissions, Plaintiff has suffered actual and statutory damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

**(Federal Theft of Trade Secret, under 18 U.S.C. § 1831 *et seq.* – Against the L'Oréal Defendants and DOES 1 through 100, inclusive)**

98.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

99.     L'Oréal entered into a Mutual Non-Disclosure Agreement (the "Agreement") with Metricolor on August 25, 2014.  The Agreement articulated the parties' obligations and considerations with respect to the Metricolor System.

100.    L'Oréal entered into the Agreement to gain access to Metricolor's trade secrets, under the guise of a good faith negotiation.

101.    These negotiations started, stalled and resumed for approximately two years, with L'Oréal executives continually making promises to Metricolor and assuring them of L'Oréal's genuine intent to do business with Metricolor.  All the while, these same executives continually sought assurance from Metricolor that Metricolor would keep the Metricolor System off the market until negotiations concluded.

102.    During these negotiations, L'Oréal personnel sought to be educated as to the inner workings of the Metricolor System, asking for sample products and demonstrations to allow them a better understanding of the product in which they had a supposed interest.  However, after they had been so instructed, and almost immediately after gaining a complete working knowledge of Metricolor's

1  confidential and trade secret information, L'Oréal ceased negotiations entirely
2  without any specific reason.

3      103.   Upon information and belief, the express purpose of these negotiations
4  was to stall Metricolor from introducing the Metricolor System into the market until
5  L'Oréal could develop its infringing products using Metricolor's confidential
6  information and trade secrets, which L'Oréal acquired pursuant to the Agreement.

7      104.   As a result of Defendants' actions and omissions, Plaintiff has suffered
8  actual and statutory damages in an amount to be proven at trial.

9      105.   Additionally, pursuant to 18 U.S.C. § 1831, *et seq.*, Metricolor seeks
10 injunctive relief as to L'Oréal's use of Metricolor's protected trade secrets and
11 asserts its right to all applicable damages.

12              **FOURTH CAUSE OF ACTION**

13  **(Breach of Covenant of Good Faith and Fair Dealing – Against the L'Oréal**
14              **Defendants and DOES 1 through 100, inclusive)**

15      106.   Plaintiff incorporates the foregoing paragraphs as if fully set forth
16 herein.

17      107.   L'Oréal entered into a Mutual Non-Disclosure Agreement (the
18 "Agreement") with Metricolor on August 25, 2014.  The Agreement articulated the
19 parties' obligations and considerations with respect to the Metricolor System.

20      108.   The Agreement, being a valid contract, established a duty of good faith
21 and fair dealing between the parties.  The Defendants, in entering into and executing
22 the Agreement, entered into a valid and enforceable contract with Plaintiff.
23 Similarly, Plaintiff, in entering into and executing the Agreement, entered into a
24 valid and enforceable contract with Defendants.

25      109.   The Agreement established an exchange of valuable consideration
26 between the parties.  Specifically, Plaintiff agreed to provide its valuable and
27 confidential trade secret information in exchange for Defendants' agreement to honor
28 the confidential nature of the information and documents being disclosed, keep the

information in strict confidence, destroy or return all confidential documents upon request, and agree not to improperly, use, decompile, disassemble, or reverse-engineer any part of the Metricolor System or any of the confidential trade secret information disclosed by Plaintiff.

110.    Plaintiff honored all its obligations under the Agreement and disclosed its confidential trade secret information regarding the Metricolor System to Defendants over several years of meetings, discussions and negotiations.  Plaintiff, through its diligence in honoring the Agreement, ensured that all conditions required for Defendants' performance of its obligations under the Agreement were met.

111.    Defendants, however, not only failed to honor their obligation under the Agreement but further acted and failed to act so as to frustrate and interfere with Plaintiff's ability to benefit from the honoring of the Agreement Plaintiff executed with Defendants.

112.    Defendants also breached the Agreement by improperly disclosing, decompiling and reverse-engineering the Metricolor System and failing to honor their obligation to return all confidential trade secret documents provided to them upon Plaintiff's written request.

113.    By entering into this Agreement, L'Oréal implicitly agreed to deal with Metricolor in good faith, and consented to conduct itself under a covenant of good faith and fair dealing, which covenant L'Oréal expressly violated by breaching its Agreement with Metricolor and interfering with Metricolor's receiving the benefits of the Agreement .

114.    As a result of Defendants' actions and omissions, Plaintiff has suffered actual and statutory damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Federal False Advertising, 15 U.S.C. § 1125(a) – Against Defendants and DOES 1 through 100, inclusive)**

115.  Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

116.  Defendants' actions described above and specifically, without limitation, constitute false or misleading descriptions of fact, or false or misleading representations of fact, regarding Metricolor's products.  Such acts constitute false advertising in violation of 15 U.S.C. § 1125(a).

117.  Consumers are likely to be deceived and misled by Defendants' descriptions and representations regarding Metricolor's products.

118.  Defendants knew or should have known that their statements were false or likely to mislead.

119.  As an actual and proximate result of Defendants' willful and intentional actions, Metricolor has suffered damages in an amount to be determined at trial and Metricolor will continue to suffer irreparable harm and damages to its business, reputation, and goodwill.

120.  As a result of Defendants' actions and omissions, Plaintiff has suffered actual and statutory damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**(Statutory False Advertising under California Business and Professions Code § 17500 *et seq.* – Against Defendants and DOES 1 through 100, inclusive)**

121.  Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

122.  California law prohibits false advertising under Business and Professions Code § 17500 et seq.

123.  Defendants' actions described above and specifically, without limitation, their misrepresentations regarding the Accused Products and their

1  unlawful usage of the patented elements of the Metricolor System constitute false

2  and misleading representations of material fact in commerce in connection with

3  commercial advertising and promotion of Defendants' products, in violation of

4  Business and Professions Code § 17500 *et seq.*

5      124.   Through their advertising and marketing, Defendants have made and

6  continues to make numerous false and misleading statements regarding Defendants'

7  Accused Products and Metricolor.

8      125.   Defendants were aware, or by the exercise of reasonable care should

9  have been aware, that its commercial representations were untrue or misleading.

10     126.   In their commercial advertising and promotion of the Accused Products,

11  Defendants have misrepresented the nature, characteristics, qualities and/or origin of

12  the Accused Products and in so doing, have damaged the Metricolor System and the

13  Metricolor brand.

14     127.   As an actual and proximate result of Defendants' willful and intentional

15  actions, Metricolor has suffered damages in an amount to be determined at trial, and

16  Metricolor will continue to suffer irreparable harm and damage to its business,

17  reputation, and goodwill.

18     128.   As a result of Defendants' actions and omissions, Plaintiff has suffered

19  actual and statutory damages in an amount to be proven at trial.

20                       **SEVENTH CAUSE OF ACTION**

21  **(California Unfair Competition Law – Cal. Bus. & Prof. Code §§ 17200,** *et seq.* **–**

22                 **Against Defendants and Does 1 through 100, inclusive)**

23     129.   Plaintiff incorporates the foregoing paragraphs as if fully set forth

24  herein.

25     130.   Defendants' conduct, in unlawfully obtaining Metricolor's confidential

26  and trade secret information, in direct violation of Defendants' own Mutual Non-

27  Disclosure Agreement, constitutes an unlawful and unfair business practice, in clear

28  violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

131.    Defendants, with the intent to market and profit from the Accused Products, made false, or otherwise misleading statements to the public in advertisements for the Accused Products.

132.    Upon information and belief, Defendants engaged in confidential discussions and negotiations with Metricolor, and even signed a confidentiality agreement with Metricolor, for the purpose of unlawfully obtaining, using, and profiting from Metricolor's confidential and trade secret information to create, market, and unfairly profit from the Accused Products.

133.    Defendants, with full knowledge of the existence of Metricolor's published provisional patent and Metricolor's intent to continue to pursue further patent protection with the United States Patent and Trademark Office, sought to profit and, on information and belief have profited, from unlawfully obtaining, using and marketing Metricolor's confidential and trade secret information.

134.    Defendants, due to their unlawful and unfair business practices, caused Metricolor undue delay in entering the market and caused Metricolor extensive financial loss by inducing Metricolor to continue to engage in discussions with Defendants regarding the Metricolor System for approximately two years, instead of entering the market early.  Defendants also caused significant damage to Metricolor in inducing Metricolor to continue its discussions with Defendants instead of being the first entrant into the market with the Metricolor System.

135.    As a result of Defendants' actions and omissions, Plaintiff has suffered actual and statutory damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

**(California Common Law Breach of Confidence – Against Defendants and Does 1 through 100, inclusive)**

136.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

137.    Defendants, as described above, entered into and executed a Mutual Non-Disclosure Agreement with Plaintiff on August 25, 2014.

138.    Defendants, pursuant to an agreement reached with Plaintiff, received confidential trade secret information.

139.    Pursuant to the parties' executed Mutual Non-Disclosure Agreement, as well as the parties' express oral agreements and mutual understanding, Defendants voluntarily received Metricolor's protected trade secret information in confidence.

140.    Defendants, and their agents, employees, and other representatives, received this protected information with the understanding that this information was to be strictly governed by the parties' confidentiality agreement.  The parties further agreed that all information transmitted to Defendants by Metricolor was not to disclosed to other parties or individuals outside of the terms of the confidentiality agreement and was not to be used by Defendants for any purposes beyond the specific limits of the parties' oral and written agreement.

141.    At no point did Metricolor, or any agents, employees or representatives thereof, give any permission of any kind, whether oral, written, express or implied, to Defendants or any agents, employees or representatives thereof, regarding any usage, transmission, or disclosure of Metricolor's confidential trade secret information in any manner not expressly allowed under the parties' Mutual Non-Disclosure Agreement.

142.    As a result of Defendants' actions and omissions, Plaintiff has suffered actual and statutory damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.  For injunctive relief;

2.  For damages according to proof;

3.  For punitive damages in an amount to be determined at trial;

COMPLAINT FOR DAMAGES

1    4. For pre- and post-judgment interest;

2    5. For costs of suit herein incurred;

3    6. For reasonable attorneys' fees; and,

4    7. For such other and further relief as the Court deems just and proper.

5

6    Dated: January 16, 2018                    MARTORELL LAW APC

7                                                        By:   /s/ Eduardo Martorell

8                                                        Eduardo Martorell
                                                         Angelo Mishriki
9                                                        Attorneys for Plaintiff,
10                                                       METRICOLOR LLC

11
                            **<u>DEMAND FOR JURY TRIAL</u>**
12
            Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 38-1, Plaintiff hereby
13
    demands a jury trial on all issues triable of right by jury.
14

15
    Dated: January 16, 2018                    MARTORELL LAW APC
16

17
                                                        By:   /s/ Eduardo Martorell
18
                                                        Eduardo Martorell
19                                                       Angelo Mishriki
20                                                       Attorneys for Plaintiff,
                                                         METRICOLOR LLC
21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES